# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 22-1501V

|  |  |
|---|---|
| KIMBERLY M. CORPENING,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: January 2, 2026 |

*Kelly Elizabeth Elder*, Martin & Jones, LLC, Raleigh, NC, for Petitioner.

*Joseph Douglas Leavitt*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT[1]

On October 12, 2022, Kimberly M. Corpening filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on October 31, 2019. Petition at 1.

Review of the record and consideration of the parties' arguments establishes that Petitioner has provided preponderant evidence that she suffered the residual effects or complications of her injury for more than six months after onset. Petitioner has also

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

established all other requirements for a Table SIRVA, including that her pain and reduced range of motion were limited to her left shoulder. Petitioner is therefore entitled to compensation.

## I. Procedural History

On April 18, 2023, this case was assigned to the Special Processing Unit of the Office of Special Masters. ECF No. 17. An initial status conference was held on November 29, 2023. On January 24, 2024, Respondent filed a Rule 4(c) Report setting forth his position that compensation would not be appropriate under the Vaccine Act. ECF No. 23 ("Rule 4(c) Report").

On July 30, 2024, I entered a scheduling order setting deadlines for briefing and for Petitioner to file any additional evidence. ECF No. 25. Petitioner filed a motion for a ruling on the record on August 29, 2024. ECF No. 26 ("Pet'r Mot."). Respondent filed a response on October 11, 2024. ECF No. 28 ("Resp't Opp'n"). Petitioner filed a reply in support of her motion on December 2, 2024. ECF No. 30 ("Pet'r Reply). This matter is ripe for adjudication.

## II. Relevant Evidence

I have reviewed all of the evidence filed to date. I will only summarize or discuss evidence that directly pertains to the determinations herein, as informed by the parties' respective citations to the record and their arguments.

### A. Petitioner's Vaccination and Initial Complaint of Left Shoulder Pain

On October 31, 2019, Petitioner received the flu vaccine in her left arm at her primary care provider ("PCP"), Southern Medical Associates.[3] Ex. 8 at 33; *see also* Ex. 7 at 2. Petitioner was 44 years at the time of vaccination. Ex. 7 at 2. Petitioner was then under a the care of a urologist for chronic interstitial cystitis, and received regular bladder instillations. *See, e.g.*, Ex. 2 at 40. Petitioner also had regular appointments with a dermatologist for acne-related skin issues and an endocrinologist for hyperthyroidism/Grave's Disease. *See, e.g.*, *id*. at 545, 1116. Petitioner did not have any previous left shoulder pain or injury.

---

[3] Respondent asserts that Petitioner's vaccination record does not provide any information regarding the site of administration. Rule 4(c) Report at 2 n.1; Resp't Opp'n at 2 n.2. However, the form from Southern Medical Associates has the notation for the left arm circled. *See* Ex. 8 at 3.

2

On November 14, 2019 (two weeks after vaccination), Petitioner had an appointment with Nurse Practitioner ("NP") Melissa Taylor at her PCP office. Ex. 8 at 14. Petitioner complained of "left shoulder pain that goes down into her elbow." *Id.* Petitioner did not recall "doing anything to her arm," and had attempted to treat the pain with Ibuprofen. *Id.* NP Taylor noted that Petitioner's left shoulder was "extremely tender" in the anterior bursa with moderate edema and limited range of motion ("ROM") related to pain. *Id.* NP Taylor encouraged Petitioner to use ice and perform gentle exercises. *Id.* NP Taylor also prescribed tramadol and prednisone. *Id.*

On November 18, 2019, Petitioner saw orthopedist Elizabeth McBride. Ex. 2 at 1518. Petitioner described left shoulder pain that "radiates to the neck and across her back." *Id.* Petitioner had limited ROM in both shoulders. *Id.* at 1522. Petitioner also complained of "intermittent numbness of the left hand" and neck pain when looking towards the left. *Id.* at 1518, 1522. However, Dr. McBride specifically stated that Petitioner's pain was "mainly located along the deltoid" and ordered x-rays of the left shoulder. *Id.* at 1523. Dr. McBride prescribed meloxicam and provided Petitioner with home exercises. *Id.*

Petitioner next saw one of Dr. McBride's colleagues in the same practice, Dr. Anastasios Papadonikolakis, on December 23, 2019. Ex. 2 at 1612. Dr. Papadonikolakis repeated that Petitioner had shoulder pain that radiated to her neck and across her back. *Id.* Petitioner now denied any neck pain. *Id.* In addition, Petitioner reported bilateral hand numbness and tingling for the past two to three weeks. *Id.* After examining her wrists, Dr. Papadonikolakis diagnosed Petitioner with carpal tunnel syndrome and prescribed her braces for night use. *Id.* at 1616-17. For her left shoulder pain, Dr. Papadonikolakis suspected a rotator cuff tear and ordered an MRI. *Id.* at 1617.

Petitioner underwent the MRI on January 24, 2020. Ex. 2 at 1769-70. The MRI revealed "[m]ild rotator cuff tendinosis with focal low-grade partial articular surface tear," "[m]oderate long head biceps tendinosis," "[m]ild superior labral fraying," and "[m]ild acromioclavicular joint degenerative changes with subacromial/subdeltoid bursitis." *Id.* at 1770.

On January 27, 2020, Dr. Papadonikolakis provided Petitioner with a referral to physical therapy ("PT"). Ex. 2 at 1796.[4] However, Petitioner let the referral expire. *See id.* at 1814. On March 13, 2020, Petitioner messaged Dr. Papadonikolakis' office requesting that they send her another PT referral. *Id.* at 1813.

---

[4] On January 29, 2020, at Petitioner's request, Dr. Papadonikolakis also provided a letter for her employer that she should be exempted from future flu vaccinations. Ex. 2 at 1802-03. Dr. Papadonikolakis wrote that Petitioner had developed "subdeltoid bursitis after a flu vaccination that she had in the fall of 2019." *Id.* at 1803.

3

### B.     Petitioner Has a Gap in Treatment During the COVID-19 Pandemic

Petitioner asserts that due to the unprecedented COVID-19 Pandemic, she received minimal medical care for the next several months and did not follow up with her PT referral. *See* Pet'r Mot. at 4-5. Petitioner did not see her dermatologist, endocrinologist, or urologist during this time. The only appointments that Petitioner had between March 2020 and October 2020 were for cold and flu-type symptoms.

On April 3, 2020, Petitioner had an appointment with NP Taylor for sinus pressure, pain, and "extensive nasal discharge." Ex. 8 at 12. NP Taylor prescribed an antibiotic. *Id.* at 13. Similarly, Petitioner saw NP Taylor on May 20, 2020 for a sore throat and nausea. *Id.* at 10. Petitioner tested positive for strep and NP Taylor again prescribed an antibiotic. *Id.* There is no indication that Petitioner mentioned her left shoulder pain at either of these appointments. *See id.* at 10-13.

### C.     Petitioner Resumes Left Shoulder Treatment

On September 18, 2020, Petitioner contacted Dr. Papadonikolakis' office for a new PT referral for her left shoulder. Ex. 2 at 1823. Petitioner stated that she was "unable to use previous [PT] therapy order due to pandemic." *Id.* The office staff mailed the PT order three days later.[5] *Id.* at 1824.

Petitioner had her first PT session on October 23, 2020. Ex. 5 at 59. Petitioner reported "left shoulder pain and a small tear which began about a year ago after a flu injection." *Id.* Petitioner rated her pain as 2-8/10 and stated that it was worse with activity. *Id.* Thereafter, Petitioner had 13 PT sessions through June 21, 2021. *See id.* at 12-57.

At her final session, the physical therapist noted that Petitioner was doing well and was "gradually returning to her normal activities." *Id.* at 14. The physical therapist found that Petitioner had met her therapy goals with the exception of ROM – Petitioner's active ROM was "technically not to goals but is similar to the right side." *Id.* Petitioner was discharged with a home exercise plan and instructed to contact her PCP to see if further follow-up was needed. *Id.* After completing PT, Petitioner continued to have dermatology and urology appointments without mentioning her left shoulder symptoms.[6]

---

[5] Petitioner also contacted Dr. Papadonikolakis' office on October 26, 2020 requesting that he fill out another form exempting her from her employer's flu vaccine requirement. *Id.* at 1834-35.

[6] The next mention of Petitioner's left shoulder occurred on August 18, 2021 when Petitioner had an appointment with NP Taylor to review lab work and complete paperwork for a COVID-19 vaccine exemption. Ex. 8 at 4. Petitioner reported that she had an "allergic reaction to the flu vaccine she took in 2019" and had a "severe inflammatory response." *Id.* NP Taylor stated that Petitioner should not receive any further

### D. Petitioner's Workplace Left Shoulder Injury

On June 29, 2022 -- over a year after her last PT session -- Petitioner had an appointment with Dr. Christopher Daly at a different orthopedist office. Ex. 5 at 8. Dr. Daly wrote that Petitioner had been sent for a worker's compensation-related evaluation of a left shoulder injury sustained on March 24, 2022. *Id.* While standing at work, Petitioner was struck on the back of her left shoulder by a heavy door. *Id.* Petitioner also reported that "she had a pre-existing problem with the shoulder from an injection which was almost resolved but still had pain in the shoulder." *Id.* Dr. Daly took x-rays of the left shoulder and recommended that she be referred to PT.[7] *Id.* at 11.

On March 27, 2023, Petitioner was seen by Dr. Erik Johnson at another orthopedist practice for a second opinion regarding the March 24, 2022 injury. Ex. 10 at 2. Petitioner again described being hit on the back and left shoulder by a heavy steel door. *Id.* With regard to her left shoulder history, Dr. Johnson wrote that Petitioner "received a vaccination into the left deltoid in 2019. She had what sounds like either a frozen shoulder or bursitis. That responded to therapy. She ended up doing well thereafter." *Id.* In terms of treatment of the March 24, 2022 injury, Dr. Johnson referenced that Petitioner had received PT and massage, which "seemed to help her out," and had undergone an MRI of the left shoulder on November 24, 2022 with "no visualized abnormality. *Id.* at 2-3. Dr. Johnson diagnosed Petitioner with a left shoulder superior labral tear and recommended an MRI arthrogram for further advanced imaging. *Id.* at 3. Petitioner did not file any additional medical records.

Petitioner filed an extremely brief affidavit stating that "[a]fter the administration of the flu vaccine on October 31, 2019, [she] began experiencing pain in [her] left shoulder where the vaccine had been administered" and that her shoulder injury "persisted for more than six months." Ex. 9 at 1.

## III. Ruling on Entitlement

### A. Legal Standards

To receive compensation under the Vaccine Program, a petitioner must prove either (1) that he suffered an injury falling within the Vaccine Injury Table, or (2) that he suffered an injury that was actually caused by his vaccine. *See* Sections 13(a)(1)(A),

---

vaccines. *Id.* at 4-5.

[7] Petitioner also saw Dr. Jason Zook on July 1, 2022 for lower back pain related to the same March 24, 2022 workplace incident. Ex. 5 at 5-6.

11(c)(1). Under either method, however, a petitioner must demonstrate that the injured person has "suffered the residual effects or complications of his illness, disability, injury, or condition for more than six months after the administration of the vaccine."[8] Section 11(c)(1)(D)(i). Cases may appropriately be dismissed for failure to substantiate the severity requirement. *See, e.g.*, *Hinnefeld v. Sec'y of Health & Hum. Servs.*, No. 11-328V, 2012 WL 1608839, at *4–5 (Fed. Cl. Spec. Mstr. Mar. 30, 2012) (dismissing case where medical history revealed that petitioner's Guillain-Barré Syndrome resolved less than two months after onset).

The petitioner carries the burden of establishing the matters required in the petition, including the severity requirement, by a preponderance of the evidence. Section 13(a)(1)(A); *see Song v. Sec'y of Health & Hum. Servs.*, 31 Fed. Cl. 61, 65-66 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 2014). Congress has stated that the severity requirement was designed "to limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine." H.R. REP. 100-391(I), at 699 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–373, cited in *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011), *cert. denied,* 132 S.Ct. 1908 (2012); *Wright v. Sec'y of Health & Hum. Servs.*, 22 F.4th 999, 1002 (Fed. Cir. 2022).

The Vaccine Act prohibits finding that a petitioner has met this burden "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a). Medical records must be considered, *see* Section 13(b)(1), and are generally afforded substantial weight. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, the Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). The factual matters required to prove elements of a Vaccine Act claim may be established by a *mix* of witness statements and record proof, with the special master required to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 (2013) (citing Section 12(d)(3); Vaccine R. 8), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Table, a SIRVA is compensable if it manifests within 48 hours of the

---

[8] Petitioner does not allege, nor would the evidence support, either alternative for establishing the severity requirement: that the alleged injury resulted in death, or "inpatient hospitalization and surgical intervention." Section 11(c)(1)(D)(ii), (iii).

administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## B. Petitioner Has Established Severity by a Preponderance of the Evidence

In order to meet the statutory six-month severity requirement, Petitioner must demonstrate, by a preponderance of the evidence, that she suffered the "residual effects or complications" of her claimed injury beyond April 30, 2020. *See* Section 11(c)(1)(D)(i).

7

Respondent's challenge to severity is based on Petitioner's lack of treatment for her left shoulder between the date of her MRI on January 24, 2020 and her first PT appointment on October 23, 2020. Rule 4(c) Report at 7; Resp't Opp'n at 7. Respondent also emphasizes that Petitioner had two PCP appointments during this period, but failed to mention problems with her left shoulder. Rule 4(c) Report at 7-8; Resp't Opp'n at 7-8.

Respondent's argument ignores key aspects of the record, and relies on the incorrect premise that a petitioner must be in formal treatment for the full six-month period in order to make out a successful claim. Although Petitioner did not follow up in-person with any provider regarding the MRI results, her request for a PT referral on March 13, 2020 strongly suggests that her left shoulder symptoms had not resolved. *See* Ex. 2 at 1814. Further, there would have been no reason for Petitioner to contact Dr. Papadonikolakis' office in September 2020 for a new PT referral if she was no longer experiencing left shoulder pain. *See id.* at 1823. And at her first PT appointment in October 2020, Petitioner linked her current pain back to the vaccination from approximately one year earlier. *See* Ex. 5 at 59.

When taken together, this evidence rebuts Respondent's argument that there is not a clear connection between her reported symptoms before and after the treatment gap. *See* Rule 4(c) Report at 8. Petitioner persuasively connects the facts of this case to another matter, *Lombardo v. Sec'y of Health & Hum. Servs.,* No. 21-29V, 2023 WL 8788989 (Fed. Cl. Spec. Mstr. Nov. 17, 2023). *See* Pet'r Mot. at 7-8. The *Lombardo* petitioner received a flu vaccine on November 8, 2019, and had several appointments regarding shoulder pain, as well as an MRI, through January 2020. *Lombardo*, 2023 WL 8788989, at *2. That petitioner was planning on getting a second opinion regarding a surgical repair, but then did not follow up with an orthopedist until October 2020. *Id.* At this appointment, the petitioner linked her pain back to the November 2019 flu vaccine. *Id.* I concluded in *Lombardo* that the petitioner had met the severity requirement, despite the ten month gap and having had two telehealth appointments for unrelated issues in the interim, and that the COVID-19 Pandemic was "a reasonable explanation for why treatment visits may have ceased for at least some of this time." *Id.* at *4.

Here as well, Petitioner's treatment gap spanned the same time period, corresponding to the strictest COVID-19-related shutdowns. When Petitioner sought a new PT referral, she specifically mentioned that she had been unable to use the previous referral due to the COVID-19 Pandemic. *See* Ex. 2 at 1823. Even if Petitioner *could have* found a way to discuss her left shoulder with her PCP or her orthopedist during the Pandemic, as Respondent contends, *see* Resp't Opp'n at 7-8, this does not detract from the evidence that her condition was ongoing. At most, as in *Lombardo*, "the light history

8

of treatment also suggests a mild injury -- which will likely impact damages in this case."[9] 2023 WL 8788989, at *4.

Respondent argues that *Lombardo* is distinguishable because the petitioner's assertion that the COVID-19 Pandemic prevented her from receiving medical treatment was "corroborated" by the fact that she had two *telehealth* appointments between January and October 2020. Resp't Opp'n at 9. But here, Petitioner's two *in-person* PCP appointments in the same timeframe "further substantiat[es] that her ability or willingness to seek medical care during the [P]andemic was not hampered." *Id.* However, my decision in *Lombardo* deemed it understandable that the petitioner did not mention her shoulder during an appointment for a work clearance and a gynecology exam – independent of when the visits occurred or their nature. 2023 WL 8788989, at *4. The same is true here of Petitioner's unrelated appointments for upper respiratory infections.

Petitioner's PCP appointments in April and May 2020 in which she did not mention left shoulder pain are admittedly not supportive of severity, but they do not disprove Petitioner's explanation that she was limited in her ability to obtain medical care during the earliest months of the Pandemic. Indeed, Petitioner also ceased treatment of her other chronic conditions during this period.[10]

Respondent also highlights the absence of evidence that Petitioner's symptoms reported after March 24, 2022 were connected to the October 31, 2019 vaccination. Rule 4(c) Report at 8. However, Petitioner makes clear that she is *not* seeking to relate her workplace injury to the vaccine. *See* Pet'r Mot. at 5-6; Pet'r Reply at 9. Nonetheless, even though Petitioner's post-March 2022 treatment should not be considered in any damages award, these records still serve to refute Respondent's primary argument that Petitioner's vaccine-related left shoulder injury resolved within six months. Petitioner's statements at these later orthopedic appointments confirm that she continued to experience residual effects from the vaccination, albeit extremely mild, beyond her last PT session. *See* Ex. 5 at 8; Ex. 10 at 2.

---

[9] Petitioner also briefly discusses *McGraw v. Sec'y of Health & Hum. Servs.* Pet'r Mot. at 8 (citing No. 21-72V, 2024 WL 1160065 (Fed. Cl. Spec. Mstr. Feb. 15, 2024); Pet'r Reply at 5. In that case, the petitioner ceased treating her shoulder entirely at the end of February 2020, just three weeks shy of the six-month period. *See* 2024 WL 1160065, at *4. I found that her reports of significant pain made it more likely than not that her pain continued for at least six months. *Id.* Further, the COVID-19 Pandemic was a reasonable explanation for the early halt to her treatment. *Id.* Although this case generally assists Petitioner, it presents a different factual scenario.

[10] Respondent implies that Petitioner was not limited by the Pandemic in seeking medical care because she had a dermatologist appointment in the time period between January 24, 2020 and October 23, 2020 to imply. Rule 4(c) Report at 8; Resp't Opp'n at 8. However, Petitioner's dermatologist appointment occurred on January 24, 2020, pre-Pandemic, and while she was still treating her left shoulder. *See* Ex. 2 at 1726.

### C. Petitioner Has Established that Her Pain and Reduced ROM Were Limited to Her Left Shoulder

Respondent next asserts that Petitioner has not met the third QAI element: that pain and reduced ROM must be limited to the shoulder in which the vaccine was administered. Rule 4(c) at 9; Resp't Opp'n at 10-11. In support, Respondent points to references to Petitioner's wrist, hands, or right shoulder in the medical records and her descriptions of her left shoulder pain as radiating to her neck or elbow. Rule 4(c) at 9; Resp't Opp'n at 10-11.

This QAI criterion is intended to "guard against compensating claims involving patterns of pain or reduced range of motion indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder." *Grossman v. Sec'y of Health and Human Servs.*, No. 18-0013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb 15, 2022). However, it is well-established that this QAI does not prevent a petitioner with "simultaneous areas of pain due to unrelated conditions from also meeting the Table SIRVA definition." *See, e.g.*, *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2021 WL 4772097, at *8 (Fed. Cl. Spec. Mstr. Sept. 9, 2021).

Respondent thus incorrectly suggests that Petitioner reported a pattern of symptoms that went beyond her left shoulder by conflating distinct conditions. Petitioner's bilateral wrist pain and numbness and tingling of the hands was recognized by Dr. Papadonikolakis as carpal tunnel syndrome, and diagnosed and treated separately from her left shoulder complaint. *See* Ex. 2 at 1612-17. Similarly, it appears that Petitioner had a pre-existing limitation in her right shoulder ROM of an unknown cause, but none of her treaters considered this as connected to her left shoulder. Ex. 2 at 1522, 1616; Ex. 5 at 14. And to the extent that Petitioner mentioned neck pain while turning her head at her first orthopedist appointment, she later denied neck pain at the next appointment. *Compare* Ex. 2 at 1522 *with* Ex. 2 at 1612. None of these issues provide preponderant evidence that Petitioner's condition was not limited to her left shoulder.

As to Petitioner's reports of left shoulder pain that radiated down to her elbow or to her neck and across her back, I have previously found that claims involving musculoskeletal pain *primarily* occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body, since the essence of the claim remains that a vaccine administered to the shoulder primarily caused pain there. *See Cross v. Sec'y of Health & Hum. Servs.*, No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Jan. 6, 2023). Further, Petitioner's treaters consistently assessed her as having a musculoskeletal injury. *See Overton v. Sec'y of Health & Hum.*

*Servs.*, No. 21-2286V, 2024 WL 1699205, at *7 (Fed. Cl. Spec. Mstr. Mar. 20, 2024). Dr. McBride noted that Petitioner's pain was "mainly located along the deltoid," and she underwent imaging and PT specifically for a left shoulder injury, not any other issue. *See* Ex. 2 at 1523, 1765; Ex. 5 at 59. Respondent's analysis is "unduly focused on just a few initial notations." *See Overton*, 2024 WL 1699205, at *7.

Respondent's reliance on *Blevins v. Sec'y of Health & Hum. Servs.,* No. 21-385V, 2024 WL 1009562 (Fed. Cl. Spec. Mstr. Jan. 12, 2024), is also misplaced. *See* Rep't Opp'n at 11 (citing). At nearly every appointment, the *Blevins* petitioner made numerous, if inconsistent, complaints of left shoulder pain coupled with neck pain, back pain, arm tingling, and/or hand weakness that began shortly after vaccination. *See* 2024 WL 1009562, at *1-*3, *5-*6. That petitioner was also diagnosed with chronic cervical and thoracic pain, and underwent a course of physical therapy specifically for those issues. *Id.* at *5-*6. Respondent's only point of comparison is that Ms. Corpening also reported radiating pain at her initial appointment. *See* Resp't Opp'n at 11. However, contrary to Respondent's assertion, Petitioner did not continue to report these non-shoulder issues throughout her treatment. *See id*. Unlike in *Blevins*, Petitioner does not present "extra-shoulder, competing symptoms" that suggest another etiology or source of her pain. *See* 2024 WL 1009562, at *6. I therefore find that she has established this QAI element by a preponderance of the evidence.

## Conclusion and Scheduling Order

Respondent does not raise any other objections to entitlement. *See generally id*. Based on my independent review, I find that Petitioner has preponderantly established all requirements for a Table SIRVA claim. 42 C.F.R. § 100.3(c)(10). Accordingly, she need not prove causation-in-fact. Section 11(c)(1)(C). I also find that Petitioner has satisfied all other statutory requirements. Section 11(c)(A), (B), and (D).

For the foregoing reasons, **I find that Petitioner has established entitlement and is thus entitled to compensation for a Table SIRVA following the October 31, 2019 flu vaccination.**

The case is now formally in the damages phase. The parties are encouraged to pursue informal resolution of an appropriate damages award. If the parties determine that informal resolution is not possible, they should be prepared to promptly brief the appropriate award of damages. In making any demand, Petitioner should make sure to take into account the mild nature of her SIRVA, and not seek to include costs or pain associated with the comorbid, non-SIRVA issues she was treated for (in particular carpal tunnel syndrome, which is not reasonably associated with a shoulder injury).

**By no later than Monday, February 2, 2026**, Petitioner shall file a Status Report updating me on the parties' efforts towards informally resolving damages.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
